**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **NOREEN A. WILSON,** ) | **CASE NO: 11-CV-2330** |
|         **Plaintiff,** ) | |
| ) | |
|         vs. ) | **JUDGE CHRISTOPHER A. BOYKO** |
| ) | |
| **CLEVELAND CLINIC** ) | |
| **FOUNDATION.,** *et al.***,** ) | |
| ) | **OPINION AND ORDER** |
|         **Defendants.** ) | |

**CHRISTOPHER A. BOYKO, J.**:

**I. ISSUE**

Plaintiff brings this action against Cleveland Clinic Foundation, Cleveland Clinic, Cleveland Clinic Health System and Michael E. Ritzenthaler (collectively "CCF"), alleging the following Claims:  FMLA Retaliation under 42 U.S.C. § 2601; Unlawful Discrimination, Hostile Work Environment, and Wrongful Retaliation under R.C. Chapter 4112; Wrongful Discharge in Violation of Public Policy; and Intentional Infliction of Emotional Distress.  This matter comes before the Court upon the Defendants' Motion for Summary Judgment (ECF DKT #17).  For the reasons that follow, CCF's Motion is granted as to Plaintiff's federal claims.  Plaintiff's remaining state law claims are remanded to Cuyahoga County Court of Common Pleas for further adjudication.

**II.  STATEMENT OF FACTS**

The following facts are not in dispute.  In October 2007 Plaintiff Wilson began working as a Pharmacist at CCF's Main Campus.  Throughout 2010, Wilson worked third-shift (8:30 p.m.

to 7:00 a.m.) on a team with two other pharmacists, one of whom was Carolyn Ford.  Wilson and Ford began working together on third shift during 2008, formed a friendship soon thereafter, and eventually became good friends.  They spent time together outside of work, and Ford told Wilson of her health issues and bipolar disorder.

As pharmacists, Wilson and her team worked in three distinct areas in the Main Campus: (1) the Sterile Products/IV Room (located in the Main Pharmacy in the basement of the H building); (2) the queue area (also located in the Main Pharmacy); and (3) the Heart Center (located in the J building).  On Friday, March 5, 2010, Wilson heard Ford yelling from the queue area and walked over to investigate.  Wilson approached the sliding window attached to the Sterile Products room, becoming concerned that Ford was having a bipolar episode.  She asked Ford if she had neglected to take her medicine, and whether she needed emergency care.  Ford yelled at Wilson, then attempted to shut the window, slamming the sliding glass against Wilson's arm.

After the altercation, Wilson reported the incident to the on-call manager, then notified Michael Ritzenthaler, the Inpatient Pharmacy Manager, who later contacted CCF Human Resources Business Partner Michelle Rigsby, who conducted an investigation.  The following Monday, March 8, 2010, Rigsby spoke with both Ford and Wilson to determine the circumstances of the altercation.  Later that day, Wilson emailed Ritzenthaler to "thank [him] for [his] intervention" and to tell him she was "considering options" and would like to look at the possibility of switching work weeks, and asked to speak with him further.  (Pl. Ex. 6.)  In response, Ritzenthaler replied to Wilson, "I am ALWAYS willing to talk.  Let me know when it is convenient for you." *Id.*  Ritzenthaler ultimately decided that Wilson and Ford should remain

in their current roles and learn to work together in a professional manner.

On March 18, 2010, Ritzenthaler issued Ford a documented counseling for acting unprofessionally and making inappropriate contact with Wilson at the vestibule window. On the same day, Wilson attended a meeting with Ritzenthaler, Rigsby and Ford during which she indicated a concern for her safety. Ford became upset during the meeting, and Rigsby told Wilson she did not want to hear about the situation again outside of the room. On March 19, 2010, Wilson submitted a request for leave under the Family Medical Leave Act ("FMLA") for the period of April 4 through May 1, 2010.

On March 22, 2010, Wilson emailed Ritzenthaler to ask if he would separate her from Ford by placing them in different work areas on a rotating basis because she was "downright terrified," did not feel comfortable working around Ford, and thought they "need[ed] time and space" in order to diffuse the situation. (Pl. Ex. 6.) She explained that this was the best way to have "some small sort of feeling of safety." *Id.* Three days later, Ritzenthaler agreed to allow the team to work a rotating schedule to ensure that, on each day of their shift, Ford and Wilson were working in different areas. The record reflects that the rotational schedule was not always followed.

From April 4 through May 1, Wilson was out on FMLA leave for, among other things, anxiety and depression. On May 26, 2010, Wilson indicated to Ritzenthaler that she was still in acute stress and was experiencing ongoing, unwanted physical contact from Ford. On May 29, 2010, Wilson again emailed Ritzenthaler asking for "reassurance that [he has] done everything within [his] power to assure [her] safety" at work, and that "such assurance will allow [her] to...'move past this.'" (Pl. Ex. 8.) Wilson stated that her doctor diagnosed her with Post

Traumatic Stress Disorder and Acute Stress Disorder and that she felt safer when she and Ford worked the rotating schedule that placed them in different locations in the Hospital.

On June 9, 2010, Ritzenthaler and Rigsby met with Wilson to discuss the concerns set forth in her May 29 email.  Ritzenthaler offered Wilson the opportunity to move to the first/second shift team.  However, Wilson declined to change shifts.  On June 13, 2010, Wilson emailed Ritzenthaler about another interaction with Ford, resulting from Ford's failure to work in her specified location, which caused Wilson to suffer a panic attack.  The next day, Wilson submitted a request for intermittent leave under FMLA from July 2, 2010 through January 1, 2011; the request was later granted.

During this time, Wilson had been attending counseling through the Employee Assistance Program ("EAP"), and asked Ritzenthaler to schedule a joint counseling session to "allow [her and Ford] to begin to clear the air."  (Wilson Tr. 201-2, Def. Ex. R.)  Ritzenthaler tried to set up a joint counseling session, but EAP declined.

In late July 2010, Ritzenthaler, who normally worked during the day, worked third shift for three days to observe the interactions between Ford and Wilson and determine whether the conflict could be resolved.  During that time, Ritzenthaler observed Ford and Wilson working in the same area, and brought them together to try to resolve the issues between them.  Ultimately, Ritzenthaler concluded that there was simply no way to resolve the conflict and that they needed to be completely separated.  Thereafter, Ritzenthaler decided to remove Ford from the third-shift team, train her for a different position, and transfer her to another building.

On August 8, 2010, just days before Ford was transferred, another incident occurred between Wilson and Ford.  According to Plaintiff, as she was leaving for the day, Ford came up

from behind her and "body slammed" her as though she had been "hit by a Mack Truck." (Wilson Tr. 222, Pl. Ex. 19.) While Defendants acknowledge the incident, Defendants assert that Ford merely, "made inappropriate contact with Wilson." (Ritzenthaler Tr. 94.) Wilson immediately emailed Ritzenthaler, and filed an incident report with CCF Police. He and Rigsby investigated the incident and concluded that Ford made inappropriate contact with Wilson, and suspended Ford for three days. Although Wilson made a report, CCF Police never investigated the incident.

When Ford returned from her suspension, she was transferred to the Children's Hospital to begin her training. After Ford's training, she would work in a different building, but would remain on third shift. Wilson contacted CCF Human Resources to request a review of Ritzenthaler's decision to let Ford remain on third shift, but Wilson was informed that a review was not available to her.

At this time, CCF began issuing Wilson corrective actions related to her job performance. On August 24, 2010, Wilson was issued corrective action for referring to another employee as a "knucklehead." On September 1, 2010, Ritzenthaler sent Wilson an email regarding the improper administration of medication and copied a CCF employee to whom Wilson had recently submitted a job application. On November 5, 2010, Wilson was issued a corrective action for hanging up a telephone while a Pharmacy Technician was using it. On the same day, based on the recent disciplinary actions and several employee complaints about Wilson's behavior, Ritzenthaler reassigned Wilson to first shift to allow Ritzenthaler to work more closely with her and provide her with more support. As a result of the reassignment, Wilson would not receive a third shift bonus. Wilson requested a right of review in response to the November 5th

corrective action, and applied for FMLA leave for the period of November 8, 2010 through January 1, 2011. The FMLA request was granted. On December, 10, 2010, Wilson was informed that her corrective action would be upheld. She was also notified that her FMLA application was incomplete and needed additional documentation.

On December 20, 2011, Wilson sent a letter of resignation to CCF with an effective date of January 2, 2011 after accepting a pharmacist position with another employer. On December 27, 2010, Wilson received a letter from Rigsby acknowledging the resignation and rendered her last day of employment December 27, 2010 because Wilson's disability information had not been received for her FMLA leave.

### III.  LAW AND ANALYSIS

#### A.  Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006); *Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). The initial burden to demonstrate the absence of a genuine issue of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). A fact is material only if its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). "Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004). However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317). Furthermore, the Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996). Rather, the burden falls on the non-moving party to designate specific facts or evidence in dispute. *Anderson*, 477 U.S. at 249-250.

### B. Count 1, FMLA Interference/Retaliation Claim

The FMLA protects employees who have worked for the same employer for at least one full year and who have provided at least 1,250 hours of service within that time period. 29 U.S.C. § 2611(2)(A). Eligible employees are entitled to up to twelve weeks of leave per year if the employee has a "serious health condition that makes the employee unable to perform the

functions of the position of such employee." *Id.* § 2612(a)(1)(D). Plaintiff has pled both an interference claim under 29 U.S.C. § 2615(a)(1) and a retaliation claim under 29 U.S.C. § 2615(a)(2), both of which are recognized theories of recovery in the Sixth Circuit for alleged violations of an employee's FMLA rights. *See Killian v. Yorozu Auto Tenn. Inc.*, 454 F.3d 549, 555 (6th Cir. 2006).

The elements of an interference claim are: (1) Plaintiff was an eligible employee, (2) Defendant was an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave employer notice of his intention to take leave, and (5) the employer denied employee FMLA benefits to which he was entitled. *Id.* See also *Cavin v. Honda of America Manufacturing Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

Here, Plaintiff contends she was denied FMLA leave in November -December of 2010. Plaintiff can show she was an eligible employee, Defendant was an employer as defined by the FMLA, and she gave notice of her intention to take the leave. In fact, she took the leave, however, Plaintiff has failed to demonstrate she was entitled to the leave and her employer denied her leave to which she was entitled.

Plaintiff failed to provide medical certifications as required by her employer. Defendant has shown Plaintiff was initially approved for FMLA leave pending her providing the appropriate medical certifications. However, Defendant contends Plaintiff never provided any certifications supporting her FMLA leave request in November of 2010.

"The FMLA states that '[a]n employer may require that a request for leave ... be supported by a certification issued by the health care provider ... [, and t]he employee shall provide, in a timely manner, a copy of such certification to the employer.'" *Verkade v. United*

*States Postal Service,* 378 Fed App'x. 567, 573, (6th Cir. 2010) quoting 29 U.S.C. § 2613(a). On November 5, 2010, Plaintiff requested leave from November 8, 2010 to January 1, 2011. (Defendant Ex. FF). Her stated reason was a work-related injury, as opposed to her request for FMLA leave in June 2010 for intermittent leave through Jan. 1, 2011, wherein she stated it was for non-work related injury. On December 10, 2010, Defendant denied Plaintiff's FMLA leave for failure to provide the appropriate medical certifications. The denial instructed Plaintiff she had until December 24, 2010, to submit the required certifications. It is undisputed that Plaintiff never submitted the certifications. "In all instances in which certification is requested, it is the employee's responsibility to provide the employer with complete and sufficient certification and failure to do so may result in the denial of FMLA leave." 29 CFR § 825.306 (2009). It is also undisputed that Plaintiff submitted her resignation on December 20, 2010, and Defendant informed Plaintiff on December 27, 2010, that her resignation was deemed effective on December 27, 2010 rather than January 2, 2011 as requested by Plaintiff due to her failure to obtain the requisite medical certifications in support of her leave request.

The Court finds Plaintiff has failed to establish a prima facie claim for FMLA interference. She does not offer any evidence or argument that she provided the requested FMLA medical certifications in response to Defendant's notice requesting such certifications.[1]

---

[1] Plaintiff offers contradictory testimony on whether she was in fact denied FMLA leave. During her deposition, Plaintiff admitted that CCF did not withhold or interfere with taking her FMLA leaves. (Wilson depo. pg 230)

Q: Let me ask you: Every time you requested your FMLA benefits, you received them, correct?

A: Yes

Plaintiff also alleges a claim under the discrimination/retaliation theory of recovery under the FMLA, which "prohibits an employer from discriminating or retaliating against an employee for taking FMLA leave ... [or] ... using the taking of FMLA leave as a negative factor in employment actions." *Krumheuer v. GAB Robins N. Am., Inc.*, 10-4396, 2012 WL 1700702, at *4 (6th Cir. May 16, 2012) (quotations omitted).

As no direct evidence of retaliation is present in this case, the Court must apply the tripartite burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973). Plaintiff must first establish a prima facie case by proving: (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Id.* If the plaintiff establishes a prima facie case, then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse action. *Id.* The burden then shifts back to the plaintiff to prove that the employer's stated reason for the adverse action was pretextual and that the true reason was the plaintiff's medical leave. *Id.*

CCF does not dispute the first two elements, but argues that Wilson 1) did not suffer an adverse employment action; and 2) that there was no causal connection between Wilson's FMLA leaves and CCF's alleged retaliatory conduct.

### 1. Adverse Employment Actions

---

She further stated her claim was for three days in which they [Defendant] withheld compensation. She then acknowledged this would not be FMLA related because it involved salary compensation. (Wilson depo. pg. 230-31).

Plaintiff asserts three potential adverse actions in support of her FMLA retaliation claim: constructive discharge, the issuance of written corrective actions in her personnel file, and being reassigned to first shift.

To establish constructive discharge, a plaintiff must present evidence to show that: 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and 2) the employer did so with the intention of forcing the employee to quit. *Logan v. Denny's Inc.*, 259 F.3d 558, 569-69 (6th Cir. 2001). Wilson alleges two theories of constructive discharge. First, Wilson alleges that CCF's corrective actions created an intolerable work climate which, combined with her shift reassignment, forced her to resign her position. Second, she alleges that being forced to work alongside Ford caused her trauma and made her feel unsafe because of CCF's failure to take the situation seriously.

The Court finds that the corrective action Plaintiff received for calling a customer/coworker a "knucklehead" is not an adverse employment action. According to the Sixth Circuit, an *employer* does not create intolerable working conditions with the intention of forcing an employee to quit when the employer's corrective actions are based upon the employee's own misconduct. *Goldfaden v. Wyeth Lab., Inc.*, No. 10-1799, 2012WL1676664, at *3 (6th Cir. May 14, 2012). Here, Plaintiff received a corrective action for calling a coworker a "knucklehead." Plaintiff does not dispute doing so and therefore, cannot rely on this as evidence of constructive discharge when it was based on her own misconduct.

The Court finds Wilson's second argument on constructive discharge unpersuasive. While a reasonable person may have found working conditions intolerable while Ford was still employed in the same area as Wilson, that was no longer the case when she submitted her

resignation in December. Ford had been reassigned in August, and did not work with Wilson during the four months leading to her resignation. Because CCF had effectively resolved the situation between Wilson and Ford some time before Wilson's resignation, the Court does not find it a sufficient basis for her allegation of constructive discharge.

Plaintiff alleges her reassignment was an adverse employment action. The Sixth Circuit is clear that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996). However, when plaintiff shows a bonus may be lost due to the reassignment, it is sufficient to survive summary judgment on this point. *Goldfaden*, at *4. Here, Wilson asserts that she lost a bonus as a result of being moved from third to first shift. Neither party gives any indication of the bonus amount, or the likelihood Wilson would receive it, however, construing the fact in Wilson's favor leads to an issue of material fact from which a reasonable jury could find that Wilson suffered an adverse employment action.[2]

---

[2] Neither Wilson or CCF has provided information as to the size or probability of receiving this bonus. Some cases have found the amount of pay loss a determinative factor and would find the amount of the bonus Wilson lost to be a significant factor. *See White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 802 (6th Cir. 2004) (finding taking away an employee's wages for one month, even though it was later reinstated, rises to the level of an adverse employment action). *But see Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (holding that plaintiff did not suffer an adverse employment action where her employer withheld one day's pay and it was not reinstated); *Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005) (holding the postponement of one-day's pay for one pay period had only a negligible impact on employee's income and did not rise to the level of an adverse employment action). Other cases have held that the showing of merely a "lower" bonus can be enough to survive summary judgment. *Goldfaden v. Wyeth Lab., Inc.*, No. 10-1799, 2012WL1676664, at *4 (6th Cir. May 14, 2012) ("Goldfaden cannot prove that she actually lost anything - but that is not the appropriate standard. . . . [T]here was a possibility that she would have received a lower bonus. This doubt is sufficient to survive summary judgment on

The Sixth Circuit has further held that "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Goldfaden*, at *3. Here, CCF issued Wilson several disciplinary actions related to unprofessional behavior, which, according to Defendant, led to its decision to reassign Plaintiff to the first shift. That reassignment ultimately allegedly caused her to lose income in the form of a bonus.

Plaintiff disputes that she hung up a phone while a coworker was using it. Because she disputes the necessity of the corrective action and because her employer argues that her subsequent reassignment was based on an "avalanche" of complaints against Plaintiff, including hanging up the phone on a co-worker, the Court finds sufficient evidence supporting a prima facie showing of an adverse employment action. Again, the corrective action was in response to complaints about Plaintiff which led Defendant to reassign her, thus costing her a bonus. Therefore, the Court finds Plaintiff has made a prima facie showing of an adverse employment action.

### 2. Causal Connection

Wilson can establish a prima facie causal connection between her adverse employment actions and her exercise of her FMLA rights. Evidence that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation, however it is not dispositive. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Temporal

---

this point.").

proximity may constitute evidence of a causal connection. *Bryson v. Regis Crop.*, 498 F.3d 561 (6th Cir. 2007)).  But see *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272-73 (6th Cir. 1986) (finding no causal connection merely because plaintiff was discharged four months after engaging in protected activity and she presented no evidence directly linking disciplinary actions to the protected activity).

Here, Wilson took approved FMLA leave between April 4 and May 1, 2010, and intermittent leave beginning July 2, 2010.  She was given a corrective action in September 2010, and reassigned in November 2010.  The parties do not dispute that before she requested FMLA leave, Wilson was never issued a corrective action, nor was she reassigned.  Wilson's final FMLA leave was not requested until after the reassignment, and therefore, is not a factor in the causal connection analysis.  However, because the corrective action and reassignment followed closely on the heels of her FMLA leave, Wilson has  established the causal connection element of her prima facie case when read in the light of the Sixth Circuit's holding that plaintiff's burden of proof at the prima facie stage is not meant to be onerous, but rather, minimal.  *Id.* at 571 (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).[3]

Even though Wilson has met her burden by establishing a prima facie case of retaliation,

---

[3]  The Court recognizes that there is tension within Sixth Circuit precedent regarding whether temporal proximity alone is sufficient to establish a prima facie showing of retaliation.  This tension is best outlined in the Sixth Circuit case of *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, (6th Cir. 2008), wherein the majority opinion and concurring opinion dispute the sufficiency of temporal proximity alone as satisfying the prima facie element of causation.  However, the majority opinion does recognize and confirm *Cooper's* holding that temporal proximity of four months or more is insufficient to establish a prima facie showing of causation without something more.  (*{Cooper}* "does not preclude plaintiffs from ever using a temporal proximity closer than four months to establish an inference of retaliation.") *Id.* at 524.

she has failed to rebut CCF's non-discriminatory explanation for her reassignment. After a plaintiff establishes a prima facie case of retaliation, the defendant may then present a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas*, at 803. Here, Ritzenthaler explained that his decision to reassign Wilson was based on several employee complaints about Wilson and her recent unprofessional conduct. Because Ritzenthaler was unable to provide assistance in resolving these issues while Wilson remained on third shift, he reassigned Wilson to the same shift he worked so he could provide her with more support.

Under the third phase of the *McDonnell Douglas* test, the employee must finally prove that the employer's stated reason for the adverse action was pretextual and that the true reason was the plaintiff's medical leave. *Id.* "[A] plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).

Wilson has failed to provide such evidence and does not even address pretext in her opposition to Defendant's Motion for Summary Judgment. She proffers no evidence of pretext under any of the three alternative showings and, therefore, the Court grants Defendants' Motion for Summary Judgment as to the FMLA Retaliation Claim since Plaintiff has failed to meet her burden to show pretext.

Pursuant to 28 U.S.C. § 1367(c) the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims in that all claims the Court has original jurisdiction over have been dismissed. The United State Supreme Court has established:

> "It has consistently been recognized that [supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."

*United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

Therefore, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's FMLA claims and remands Plaintiff's remaining state law claims to Cuyahoga County Court of Common Pleas for further adjudication.

        IT IS SO ORDERED.

                              s/ Christopher A. Boyko
                              CHRISTOPHER A. BOYKO
                              United States District Judge

Dated:  February 6, 2013